# HILLSBOROUGH,

## DECEMBER TERM, A. D. 1850.

---

## GIBSON & a. v. POOR.

In settling a disputed line between two adjoining lots in a town, a corresponding line between adjacent lots which is undisputed, may be given in evidence as tending to show the true line between said adjoining lots.

Where a question arose between G. and P., as to the line between lots five and six in the twelfth range in the town of G., evidence showing that the line between the adjacent lots five and six in the thirteenth range, which was undisputed, corresponded with the line claimed by P. in the twelfth range, was held admissible.

The defendant offered an ancient plan of the town of G., without date, which was much worn, and purported to have been made by one P. It was obtained from the possession of one G., a surveyor still living, but an aged man whose faculties were considerably impaired. More than thirty years ago, said G. was town-clerk of the town of G., and at that time the plan was kept among the records of the town and examined by its inhabitants. By the records of the proprietors it appeared that in 1745, P. and another were appointed to survey the lands into town lots. *Held*, that the evidence was competent and admissible to show the plan to be genuine.

TRESPASS, for breaking and entering the close of the plaintiffs, in Goffstown, and carrying away a quantity of their wood and timber. Plea — the general issue.

The plaintiffs introduced a deed from John Farmer to themselves, dated March 1, 1848, conveying the *locus in quo*. They then proved, that immediately after the date of their deed they went upon the premises and cut wood and timber thereon. The defendant admitted, that he took and carried away from the premises a portion of said wood and timber. A view was had by the jury, and the plaintiffs here rested their case.

The defendant contended that the *locus in quo* was his land

and that he had a right to take and carry away the wood and timber. He claimed that the premises in dispute were a part of lot number six, in the twelfth range of lots in Goffstown; and it appeared, that if they were a part of said lot, the defendant had a good title to the same.

The plaintiffs claim, that the premises in dispute were a part of lot number five in said twelfth range; and the principal point in controversy between the parties was, as to where the true line between lots five and six was.

It appeared that the thirteenth range of lots in Goffstown adjoined the twelfth range on the east, and there was no dispute between the parties as to where the true line between lots five and six in the thirteenth range was. It also appeared, that an extension of said line in the thirteenth range westward through the twelfth range, would make the line in the twelfth range fall where the defendant contended it should.

The defendant then introduced several witnesses who had examined the line in the thirteenth range, and whose testimony tended to show that it was a well established and marked line. These witnesses further testified, that after running across between lots five and six in the thirteenth range to the westward, they run on the same course forty or fifty rods on the twelfth range, and that they found several trees marked on both sides, as line trees, with apparently old marks. But they did not cut into any of them to ascertain their ages, nor run across the range, which was two hundred and forty rods.

To the competency of this evidence as tending to show where the true line was, the plaintiffs' counsel excepted, but it was admitted by the court. Other evidence was also offered by the defendant, tending to establish the line he contended for as the true one.

In the course of the trial the defendant offered a plan of the town of Goffstown, and called the clerk of the town to show that it came from among the records of the town, and that he received it, with the other papers and records, from his predecessor in office. There was also evidence tending to show that it had been in the town-clerk's office for a number of years. Upon the

inspection of the plan, however, it appeared to be a copy, and the plaintiffs objecting to its reception, it was withdrawn, by the defendant.

At a subsequent stage of the trial, the defendant offered the records of the proprietors of said Goffstown, produced by the town-clerk, from which it appeared, that in 1745, Matthew Patten and another person were appointed to survey the lands in said town into lots. He then offered a plan, which upon inspection appeared to be ancient and much worn, purporting to have been made by said Matthew Patten, but bearing no date. It appeared that this plan was obtained from the possession of John Gilchrist, a surveyor, still living in Goffstown, but an aged man whose faculties were considerably impaired. That more than thirty years ago Gilchrist was town-clerk of said Goffstown ; and when such town-clerk, said plan was kept among the records and papers of the town, and was frequently examined by the inhabitants of the town ; but how it came separated from the records of the town did not appear. The plaintiffs excepted to the competency of this evidence, and to the admission of the plan, but the exception was overruled by the court. The plan first presented was a copy of the last one.

The jury returned a verdict for the defendant, and the plaintiffs moved to set the same aside and for a new trial, for supposed error in the foregoing rulings of the court. And the questions arising upon said motion were transferred to this Court for decision.

*D. Clarke,* for the plaintiffs.

*W. C. Clarke,* for the defendant.

EASTMAN, J. It is believed to be a well settled principle, that lines, monuments, and boundaries which are established and undisputed, although not immediately connected with the land in controversy, are nevertheless proper and competent evidence to be considered by a jury, whenever they tend to elucidate the subject in dispute. The manner in which the lands of this country

were originally surveyed and occupied, has rendered such kind of evidence oftentimes the most satisfactory in ascertaining the true line between adjoining lots, or the line adopted and recognized as true by the original settlers. Mr. Greenleaf, in his work on evidence, remarks, that by far the greatest portion of our territory was originally surveyed in large masses or tracts, owned either by the State, or by the United States, or by one or a company of proprietors; under whose authority these tracts were again surveyed and divided into lots suitable for single farms, by lines crossing the whole tract, and serving as the common boundary of very many farm lots lying on each side of it. So that it is hardly possible to prove the original boundaries of one farm without affecting the common boundary of many. 1 Greenl. Ev. § 145, note. These remarks apply in their full force to the original survey of lands in this State. Proprietors of tracts and townships held their meetings, appointed their surveyors, run out their lands, made plans and maps of the same, drew their rights and made conveyances when deemed necessary. These records and plans are the source of most of the titles to real estate within our limits; and when properly verified are always received in evidence in all matters to which they refer. Such is the constant practice of the courts in this State, and such is also the general practice of most other jurisdictions. Records of original proprietors, their plans and maps, the location of lands by the ancient settlers, and all evidence, whether documentary or parol, which bears upon the point at issue and is not inadmissible upon general principles, is received in cases of disputed boundary. In *Smith* v. *Perwitt*, 2 A. K. Marsh. (Ky.) Rep. 158, it is said that boundary may be proved by every kind of evidence which is admissible to establish any other fact; and, where the boundary is ancient, even reputation is admissible. To the same effect are *Taylor* v. *Rowe et al.* 4 Hawks, 116; *Smith* v. *Norvells*, 2 Littell, 159; *Ralston* v. *Miller*, 3 Rand. 44. In some respects courts have gone farther in breaking over established principles of evidence upon this subject than upon almost any other. Hence, heresay, not amounting to tradition or general reputation, but from a single

individual, is received upon this subject. Some courts confine this description of evidence to boundaries of parishes and such tracts as are of general and public interest, while others admit it in all controversies, whether pertaining to public or private rights. The English rule confines it to matters of public and general interest, and the same rule is adopted in some of the United States; while in other States the evidence is freely admitted without regard to the nature or character of the tract in dispute, or the parties interested therein. Among the numerous authorities bearing upon this matter may be enumerated, *Boardman* v. *Read*, 6 Peters, 341; *Buchanan* v. *Moore*, 10 Serg. & Rawle, 281; *McDonald* v. *McCall*, 10 Johns. 377; *Spear* v. *Cate*, 3 McCord, 227; *Wooster* v. *Butler*, 13 Conn. 309; *Weems* v. *Disney*, 4 Har. & McHen. 158. In this State the rule is, that statements of deceased individuals who from their situation had the means of knowledge and no interest to misrepresent, are admissible. *Shepherd* v. *Thompson*, 4 N. H. Rep. 213. The practice under this decision has been, not to limit the evidence to subjects of general interest, but to extend it to all matters of boundary, whether pertaining to public tracts or private rights.

In addition to these general principles, and others that might be commented upon, which run through all the authorities, there are some decisions which bear more directly upon the precise questions raised in this case. In *Tate* v. *Southard*, 1 Hawks, 45, it was held that the lines of the surrounding tracts, if made for those tracts alone, might be received as competent to show the line of the particular tract in dispute. *Rockwell* v. *Adams*, 6 Wend. 467, was an action of trover brought for the conversion of certain saw-logs; and the question between the parties was as to the line between their lots; the plaintiff owning on the south, and the defendant on the north; the land of both being a part of a patent or tract of two thousand acres. It appeared that the land east and west of that in dispute, was owned by the defendant and other individuals, and the plaintiff was permitted to introduce evidence to show that they occupied up to a line corresponding to the one claimed by him. He was also permit-

ted to prove that the settlers on a patent adjoining this one of two thousand acres, had taken possession and occupied up to the line which he claimed. The evidence in both particulars was excepted to, but the case being carried to the Supreme Court, it was all held admissible. With regard to the evidence as to the possessions of the settlers in the adjacent patent, the Court remarked that it was properly received, and that if an erroneous location had been made, which would be disturbed by extending the defendant's line, considerations of public policy forbade that such errors should be thus corrected, where the consequence would be a corresponding change in the possessions of the whole neighborhood. Taking the doctrine of this last case to be law, there can be no doubt of the admissibility of the evidence as to the line between lots five and six in the thirteenth range, nor that it had a direct tendency to fix the line as claimed by the defendant. The decision goes farther, as does also *Tate* v. *Southard*, than it is necessary to go, in holding the evidence referred to in this case to be admissible.

The evidence in regard to the plan found in the possession of Gilchrist, was also competent to be considered. Had this plan been produced from among the records of the town-clerk, having been received by him from his predecessor in office, there would probably have been no question made respecting it; for notwithstanding it is without date, yet being ancient, and made by Patten, and the records showing that Patten with another was appointed to survey the town into lots, the whole current of authorities sustains its admissibility. *Chapman* v. *Cowlan*, 13 East, 10; 1 Phil. Ev. 418; Ib. 481; 4 Esp. 1; 6 Dow. 202; *Hewlet* v. *Cock*, 7 Wend. 374; *Jackson* v. *Luquere*, 5 Cowen, 225; *Jackson* v. *Larroway*, 3 Johns. Ca. 283; 1 Greenl. Ev. § 142. The want of date cannot be regarded as very material. A plan or survey is not a paper requiring any formal date, and in very many instances it is not dated. It is unlike many instruments, where the date forms an essential part of the paper. A date to a plan may, in some instances, when taken in connection with other facts, add weight to its character as evidence, but as a general thing it cannot be essential. Even the date to a deed

37 *

is regarded as formal. It does not always show the true time of delivery, and can be contradicted. *Lee* v. *Massachusetts Fire Ins. Company*, 6 Mass. 208 ; *Maynard* v. *Maynard*, 10 Ib. 108 ; *Jackson, ex dem. Hardenberg* v. *Schoonmaker*, 2 Johns. 230. If there is no date to a will, the true time of its execution may be shown, or it may be shown that there is a mistake in the date. *Deakins* v. *Hollis*, 7 Gill & Johns. 311.

The reason why it is required that an ancient document shall be produced from the proper depository is, that thereby credit is given to its genuineness. Were it not for its antiquity, and the presumption that consequently arises that evidence of its execution cannot be obtained, it would have to be proved. It is not that any one particular place of deposit can have more virtue in it than another, or make that true which is false ; but the fact of its coming from the natural and proper place, tends to remove presumptions of fraud, and strengthens the belief in its genuineness. It may be false, and so shown, notwithstanding the presumptions in its favor. If found where it would not properly and naturally be, its absence from the proper place must be satisfactorily accounted for ; but that being done and all suspicions against its genuineness removed, we can discover no reason why it may not be read in evidence. The real question which is to affect its consideration with the jury is, whether the instrument offered is genuine, and contains a true statement of what it purports to. In the *Bishop of Meath* v. *Marquis of Winchester*, 2 Bing. 183, *Tindal*, C. J., speaking of ancient documents, holds this language. " It is not necessary that they should be found in the best and most proper place of deposit. If documents continued in such custody, there never would be any question as to their authenticity ; but it is when documents are found in other than their proper place of deposit, that the investigation commences whether it was reasonable and natural under the circumstances in the particular case, to expect that they should have been in the place where they are actually found ; for it is obvious, that while there can be only one place of deposit strictly and absolutely proper, there may be many and various that are reasonable and probable, though differing in degree ;

some being more so, some less; and in those cases the proposition to be determined is, whether the actual custody is so reasonably and probably accounted for, that it impresses the mind with the conviction, that the instrument found in such custody must be genuine." Some authorities hold, that the antiquity of the document is alone sufficient to entitle it to be read, and that the other circumstances only go to its effect in evidence. 2 Poth. Ob. App. XVI. § 5, p. 149. See also *Jackson* v. *Larroway*, 3 Johns. Ca. 283; *Doe* v. *Burdett*, 4 Ad. & El. 1.

Gilchrist, in whose possession this plan was found, had been town-clerk of Goffstown more than thirty years ago, and when such clerk, the plan was kept among the records of the town, and was frequently examined by its inhabitants. This fact, taken in connection with the records of the proprietors, tends strongly to show its genuineness. At that time it would probably have been received in evidence without exception. The copy first produced on the trial, having been among the records of the town for a number of years, may very likely have been made by Gilchrist himself, as a substitute for this ancient one which had become much worn by use; and Gilchrist on leaving the clerk's office, may have taken the ancient one as valueless, and left the copy as the one usually examined; or he may have borrowed the ancient one for some purposes of surveying. But however it may have become separated from the records, there are facts enough connected with it, from which to find its genuineness as the original plan, and that being established, no further question arises upon it. Even if this ancient plan had not been found, we are not prepared to say, that the copy presented could not have been used. Ancient plans must at some time become worn out by age and use; and the necessity of the case seems to require that their place be supplied by copies. After these copies have been kept among the records, and used by the inhabitants a sufficient number of years to raise the ordinary presumption of genuineness, can they not be used as substitutes for the originals, without resorting to proof of being true transcripts, if the originals cannot be found, or have become defaced and unintelligible by use? If the originals should be lost, there

- would be no doubt of the competency of the copies as secondary evidence, and the reason would seem to be quite as cogent for the admission of copies after the originals had become defaced. by age and use.

The object of courts and juries in all their investigations, is to elicit the truth, and in so doing to have recourse to the most satisfactory sources of evidence within their power. Holding this plan to be a true index to the boundaries and location of the lots in this town, we think, that, taken in connection with the marked trees between lots five and six in both ranges, there cannot be any doubt of the correctness of the verdict in this case, nor any. doubt that the evidence showing the marked trees was admissible. The lines in the plan run through the whole tract, whether they be traced between the ranges, or between the corresponding numbers in the several ranges. They were evidently all established at the same time ; and the marked trees between lots five. and six in the thirteenth range, about which the parties do not. differ, corresponding with those found in the twelfth range, we regard the evidence received, as not only competent, but highly satisfactory, and tending strongly to fix the true line between the parties.

. Entertaining these views, it is the opinion of the Court that there should be.

*Judgment on the verdict.*