RICHARD DEZ. PIERCE & another, administrators, *vs.*
COLUMBIA SECURITIES COMPANY & others.

Suffolk.    May 22, 1923. — September 13, 1923.

Present: RUGG, C.J., BRALEY, DECOURCY, CROSBY, & PIERCE, JJ.

*Equity Pleading and Practice,* Master: findings; Appeal.  *Equity Jursidiction,*
    Specific performance.  *Contract,* Performance and breach.

Upon an appeal from a decree in a suit in equity which had been referred to a
    master by a rule directing him "to hear the parties and their evidence, to
    find the facts, and report the same to the court," findings of fact by the
    master in a report which does not include a report of the evidence must
    stand unless on the face of the report they are mutually inconsistent or
    contradictory and plainly wrong.
Several brothers, who owned the capital stock of several corporations, fell
    into disagreement and two of them obtained judgments against the others.
    To provide for the payment of the judgments, there were conveyed by others
    of the brothers to one of the two who were judgment creditors shares of stock
    sufficient in number to give the transferree control of the corporations and
    by an agreement in writing he was given power in substance to manage
    the corporations in his discretion and also to save collateral by payment
    of outstanding debts of others of the brothers and to hold the collateral
    subject to the terms of the agreement, which included liquidation of the
    judgment debts and the ultimate return of the securities to the respective
    brothers.  The brother thus put in control used funds of various of the
    corporations to pay debts of one of the brothers in order to redeem collateral
    and then placed that collateral in the possession of the sundry corporations
    who had advanced the money.  After the death of the brother whose debts
    thus were paid, the administrator of his estate contended that the control-

ling brother should retain such collateral and have it available for distribution. *Held,* that the redeemed collateral properly was retained in the possession of the respective corporations who had furnished the money to discharge the indebtedness and thereby to release the security.

Specific performance of a contract will not be ordered in a suit in equity where it appears that the plaintiff had not performed and is unable to perform material obligations which were to be performed by him under the contract.

In a suit in equity by the administrator of the estate of one of six brothers against the other five to require specific performance of a contract whose provisions required the transfer by the plaintiff's intestate to the defendants of certain corporate stock for them to use under the terms of the contract, a master found that the plaintiff's intestate had not made such transfer of the stock and that the plaintiff had not the stock to transfer. By an interlocutory decree, a motion by the plaintiff to recommit the report was denied, exceptions by the plaintiff to the report were overruled and the report was confirmed. The plaintiff appealed from the interlocutory decree. Seven days later the plaintiff and one of the defendants, without leave or knowledge of the court, filed a "stipulation" which stated that, "whereas the plaintiff and" the named defendant "have jointly a sufficient number of shares . . . to complete the contract . . . in above entitled suit and have always been ready to use their stock jointly if necessary to do so, it is hereby stipulated that the said shares . . . shall be used to furnish all the shares due . . . under contracts to be specifically performed." Two days later, a final decree dismissing the bill was filed. Eighteen days thereafter the defendants, other than the one who with the plaintiff had signed the stipulation, moved that it be stricken from the record and, two days thereafter, on the same day an interlocutory decree granting that motion was entered and the plaintiff and the defendant joining with him in the stipulation appealed from such interlocutory decree and from the final decree. *Held,* that

(1) The "stipulation" in itself could not take the place of a motion to amend under Equity Rule 25 by discontinuing against the defendant signing it and joining him as a plaintiff and alleging that the joint stock holdings of its signers were sufficient to permit a performance of the contract;

(2) Considered as a statement of fact to be proved, the mere filing of the "stipulation" could not prevent nor stay the entry of a final decree in the suit which was ripe for such entry before the filing of such alleged fact;

(3) Even if the filing of the "stipulation" were treated as a motion to amend, the action of the court must be looked upon as a denial of it in a proper exercise of discretion;

(4) The motion to strike the "stipulation" from the record was filed after the entry of the final decree and the court was without jurisdiction to receive or pass upon it;

(5) The action of the court striking the "stipulation" from the record was not harmful to the plaintiff and was disregarded.

BILL IN EQUITY, filed in the Supreme Judicial Court for the County of Suffolk on December 1, 1919, and afterwards

amended, by D. M. James against Columbia Securities Company, H. J. James, E. B. James, W. A. James, Alice James, Hamlin Bank and Trust Company and the Attorney General, seeking, in the main, a receivership of the Columbia Securities Company and a winding up of its affairs or, in the alternative, that certain contracts made previous to the organization of Columbia Securities Company be specifically performed.

D. M. James died and, on February 17, 1920, the plaintiffs were admitted to prosecute the suit in his stead.

The suit was referred to a master. Material findings by the master and exceptions to his report are described in the opinion. The plaintiffs also filed a motion to recommit the report to the master which was not printed with the record. The exceptions and the motions were heard by *Carroll*, J., by whose order an interlocutory decree was entered overruling the exceptions, denying the motions and confirming the report, from which the plaintiffs appealed on June 20, 1922.

On June 27, 1922, the " stipulation " described in the opinion was filed. On June 29, 1922, by order of *Carroll*, J., a final decree was entered dismissing the bill. On July 17, 1922, the defendants filed a motion to strike the " stipulation " from the record. On July 19, 1922, the plaintiffs and H. J. James severally appealed from the final decree and on the same day, by order of *Crosby*, J., a decree was entered granting the motion that the " stipulation " be stricken from the record, from which the plaintiffs and H. J. James appealed.

The case was submitted on briefs.

*A. M. Beale*, for the plaintiffs.

*H. J. James, pro se.*

*C. M. Cram*, for the Columbia Securities Company and and W. A., E. B. and Alice James.

PIERCE, J. This is an appeal by the plaintiffs from interlocutory decrees overruling exceptions to and confirming the findings of the master, from an interlocutory decree ordering a certain alleged " stipulation " to be stricken from the records of this court, and from a final decree dismissing the plaintiff's bill.

D. M. James, the plaintiff, died on January 8, 1920, and
the administrators of his estate, Richard deZ. Pierce and
Arthur M. Beale, Esquire, were admitted as parties plaintiff
to prosecute the action.   The defendant Alice James is the
widow and personal representative of D. W. James, herein-
after referred to.   Following the death of the plaintiff and
the appointment of the administrators of his estate, the
original bill was amended by additions to the several para-
graphs thereof and to the prayers for relief.   The plaintiffs
have abandoned all claims to relief under the facts charged
in the original and amended bill, except in so far as the facts
proved in such bills entitle the plaintiff to specific perform-
ance of the agreements.   The cause was referred to a master
" to hear the parties and their evidence, to find the facts, and
report the same to the court."

Without a report of the evidence the facts found by the
master must stand unless on the face of his report they are
mutually inconsistent or contradictory and plainly wrong.
*Glover* v. *Waltham Laundry Co.* 235 Mass. 330, and cases
cited.   The facts found by the master establish that prior
to 1910 the plaintiffs' decedent with his five brothers owned
all or practically all the stock of eight corporations organized
under the laws of the State of Pennsylvania.   They also
owned exclusively the stock of a corporation organized under
the laws of West Virginia, but neither this corporation nor
any stock thereof is involved in this litigation.

A want of harmony in the management of the corporations
developed in the year 1910.   In that year D. M., H. J.,
E. B. and D. W. James, combined their interests and agreed
to organize in Massachusetts the corporation which became
known as the Columbia Securities Company and which is
one of the defendants in this suit in equity. · When the
corporation was formed in 1910 each of the four brothers in
combination agreed to transfer and convey to the Columbia
Securities Company certain specific shares of stock; and it
was agreed between them that the Columbia Securities
Company should issue and deliver in return and payment
therefor stock and securities issued by that company, thereby
constituting the latter a holding company.   Each of the

four brothers executed an agreement with the other three. These agreements were all executed in anticipation of and before the company was organized, and represented what the four brothers intended, when they signed the agreements, to have transpire when the new Massachusetts corporation should come into being. The original scheme was never fully carried out. Some stock was transferred to the company by each of the four brothers, but they took payment partly in stock and partly in bonds. D. W. and E. B. James transferred in compliance with the terms of the agreement more stock than D. M. and H. J. James, and through their ownership of a majority of stock in the holding company had control over all the corporations.

At the times these agreements were signed D. M. and some of the others had outstanding individual indebtedness for which the stock which they agreed to turn over to the Columbia Securities Company was pledged as collateral; and although the individuals retained title to this stock and exercised the right of voting the stock, D. M. " never during his lifetime had in his physical possession, ready for delivery, a sufficient number of shares to comply with the provisions of . . . [the fraternal agreement,] either as originally drawn or as modified by the corporation votes." The master further finds that " The complainants, as administrators of his estate, have never been, and are not now, in possession of certificates of stock sufficient in number to make up the difference between what was turned over to the Columbia Securities Company by D. M. and the amount which he had agreed to deliver."

It further appears that neither W. A. nor J. C. James was a party to agreements of the four brothers; and that neither of them originally held any stock, common or preferred, or any collateral trust bonds or debenture bonds of the Columbia Securities Company; that the scheme for the organization of the Columbia Securities Company to act as a holding company for the management and control of the Pennsylvania corporations, did not meet with the approval or support of either W. A. or J. C. James; that they offered to sell their stock to the other four brothers; that they were unable

to agree upon a price for the stock; that W. A. and J. C. thereupon each brought a suit in the Pennsylvania courts for a receiver, the dissolution of all the Pennsylvania corporations and the winding up of their affairs; that when these suits came on for trial, at the court's suggestion agreements were entered into between the parties, which agreements are annexed to the master's report and in substance, so far as is material to this litigation, state that W. A. and J. C. James on the one part agree to sell and the four other brothers agree to buy, the interest of W. A. and J. C. in all the Pennsylvania corporations, and W. A. and J. C. agree to buy and the other four brothers agree to sell, the interest of the other four in the other corporations and real estate; that the price was to be fixed by " appraisers " and that all conveyances and payments were to be made in thirty days from the date of the receipt of the report of the appraisers.

It appears that the four brothers who had caused the formation of the securities company were dissatisfied with the report of the appraisers and refused to abide by the arbitration; that thereupon W. A. and J. C. James each brought suits under the above contract dated January 30, 1911, and W. A. recovered judgment in his action in the sum of $106,210.72; that H. J. and D. W. soon after that agreed that J. C. James had a claim against the four brothers amounting to about $125,173.80 and interest; that on August 12, 1913, W. A. and J. C. entered into an agreement with D. W. and H. J. James stating that the assets of H. J. and D. W. then consisted to a considerable extent of stocks, bonds and corporate securities under attachment issued on said judgment; that the agreement then proceeded to give power of attorney to W. A. James to act in behalf of H. J. and D. W. to vote, use and control the stock owned by them as set forth in a certain schedule, so as to enable him, the said W. A., to collect his judgment and the claim of J. C. The agreement further recites that it is the purpose of W. A. to collect from the codefendants of H. J. and D. W. (D. M. and E. B. James) as much as one half of said judgment and the claim of J. C. if possible, and upon the collection of said judgment and claim either from the assets of D. M. or E. B., or from

the securities of H. J. or D. W. he, the said W. A., will then make distribution of said property, stock, bonds and corporate securities belonging to the said H. J. and D. W. as in his judgment alone may seem right and proper.

It further appears that on November 20, 1913, another agreement was made between W. A. and J. C. on the one part and D. M. and E. B. on the other part. This agreement recited the facts with relation to the recovery of judgment by W. A. and the existence of the claim of J. C. and it was agreed that D. M. and E. B. should turn over to W. A. all their stock in the Kane and Elk Railroad Company, James Brothers Lumber Company, James Manufacturing Company, Lamont Chemical Company, Consolidated Chemical Company, James City Realty Company, and James City Gas Company, except qualifying directors' shares; also their interest in the Hovencamp Gas Property, and all of the interests and stock in the William James Sons Company. They further agreed to turn over to W. A. all stocks and bonds issued in the Columbia Securities Company, subject to legal liens thereon, except what was then held by W. A. James, the said W. A. to provide the money to purchase, not to exceed $3,500, bonds of said company at par. It was provided that in the event of said stocks and bonds being hypothecated by D. M. and E. B., the said W. A. and J. C. were authorized to liquidate such loans and to take and hold the collateral that may have been deposited to secure the same subject to the terms of this contract.

" It is further provided that it is the intention of this agreement to place in the hands and control of W. A. the several corporations above named to the end and purpose that the said W. A. shall have, hold and manage the same as in his judgment shall seem fit and proper; that he shall elect such boards of directors or vote the stock of said several corporations in such a manner as he sees fit and with the same force and effect as if he were the actual owner thereof.

" The agreement further provided that notwithstanding the powers given to W. A., the said D. M. and E. B. were to be elected directors of certain corporations, and managers, at a stipulated salary, of certain corporations.

" The agreement then recites that it is the ultimate purpose of this agreement to pay the indebtedness to W. A. and J. C. and that this is to be accomplished either out of the earnings of the corporations or by conversions of the assets of the same in such manner as the boards of directors shall provide, and that the said W. A. shall have the right to dispose of the assets of said corporations and apply the proceeds thereof to the liquidation of the indebtedness.    There was, however, a proviso that the said W. A. should not have the right prior to the expiration of three years from date of the agreement to dissolve any of the corporations except the Consolidated Chemical Company.    The agreement recognizes that there is certain outstanding indebtedness of the said D. M. and E. B. James, and of the several corporations mentioned which it may be necessary to take into consideration in carrying out the purposes of the contract, and that W. A. will use his influence to have the indebtedness carried, if possible, until it can be paid from the management of said corporations, but if it becomes necessary in order to save collateral, the debts may be paid by the said W. A. individually, and he thereby acquire the collateral and hold the same subject to the terms of this agreement."

H. J. and D. W. delivered to W. A. most, but not all, of the stocks and bonds they had agreed on August 12, 1913, to turn over; but E. B. and D. M. failed to deliver the stocks and bonds covered by their agreement of November 20, 1913, or to turn over to the possession of W. A. the books and papers of the various corporations.    It appears that in December, 1913, W. A. brought a bill in equity in the Pennsylvania courts alleging these facts and making other allegations (the truth of which the master does not pass upon), and praying for specific performance of the agreement of November 20, 1913, and for a receiver.

It further appears that the defendant Hamlin Bank and Trust Company was appointed receiver for all the Pennsylvania corporations.    The receivership lasted until October 15, 1914.    During all this time the Commonwealth Trust Company of Boston, Massachusetts, had been acting as trustee under the collateral trust deed from the Columbia

Securities Company. On October 25, 1917, the directors of the securities company, including E. B. and D. M. James, but not including J. C. and D. W. (the first of whom was never a director and the second of whom had resigned on November 29, 1913), by a unanimous vote elected the Hamlin Bank and Trust Company trustee in place of the Commonwealth Trust Company. The master specifically finds that the selection of the Hamlin Bank and Trust Company to act as trustee " was with the knowledge, consent and approval of D. M. James " the original plaintiff in this cause. He further finds that " at the time of this appointment, W. A. James was in actual control of all of the Pennsylvania corporations and the Columbia Securities Company. In fact, this had been the condition of affairs since shortly after the appointment of the Hamlin Bank and Trust Company as receiver; " that " The receivership was only nominal, and the actual management of the affairs of the corporations was entirely in the control of W. A. James. The sole reason for the receivership proceedings was to compel D. M. and E. B., against whom W. A. and J. C. had succeeded in establishing claims, to carry out the terms of the agreement of November 20, 1913, and to place W. A. in position to collect these claims on behalf of J. C. and himself, and with the understanding and agreement by all parties, that when he and J. C. had been so paid, they were to retire from the Pennsylvania corporations, and turn the stock and management over to the other four brothers." It appears that the business of some, if not all, of the Pennsylvania companies, was financially successful, and at last, in 1919, the claims of W. A. and J. C. James, which by that time had amounted with interest and costs to approximately $300,000, were fully paid, or the earnings of the various Pennsylvania corporations were sufficient so that they could have been paid.

The master finds that the make-up of the contending factions had by that time changed. D. W. had died and D. M. had lost the controlling influence which he had theretofore exerted over E. B., who appears to have gone over to the side of W. A., while H. J., who had theretofore been

coöperating with W. A., again became a partisan of D. M. W. A. showed no disposition to turn over the stock and control of the various companies or retire from their management, and this resulted in the institution in the Pennsylvania courts of proceedings against him. As a result, the parties filed a stipulation which is annexed to the master's report. It provided that certain exceptions filed by D. M. James were withdrawn without prejudice; that W. A. was to continue the management of the various corporations for a period of ninety days from July 10, 1919; that during said ninety days W. A. was to take such action as might be necessary to pay himself and J. C. the balance due them, and at the expiration of the period turn over the property and assets and management of the corporations, as provided in the contract of November 20, 1913; and that W. A. was forthwith to advance to D. M. $500 upon delivery to him by D. M. of his collateral note payable to the Lamont Chemical Company in ninety days. Pursuant to this stipulation W. A. turned over to the four brothers certain stocks and bonds.

In considering the charge of the administrators of the estate of D. M. James, set out in the amended bill, " that all stocks in the underlying companies owned by D. M. James and other parties under said contract were put into the possession or control of said W. A. James and they are still in the possession or control of said W. A. James or other parties to this litigation, or of the corporations controlled exclusively by parties to this litigation, and are available for the carrying out of said contracts, by transfer of their said stock to said Columbia Securities Company," the master recites that he is " unable to find the facts in terms as stated. There is, however, no question but what all the stocks and bonds that W. A. claimed he was entitled to receive were placed in his possession and control, and that he managed and controlled the various corporations for several years. It is also clear that, in the summer of 1919, he returned to their respective owners certain of the stocks and bonds held by him under the contract. Some of the stocks and bonds standing in the name of D. M. were, however, at that time

held by some of the underlying corporations under the claim that they were collateral for certain alleged indebtedness of D. M." He further finds that the allegation taken from the amended bill, that all stocks in the underlying companies owned by D. M. and other parties " are available for the carrying out of said contracts by transfer of their said stock to said Columbia Securities Company " is not supported by the evidence. In this regard he also finds that the stock for carrying out the contracts will not be available until the claims of the underlying corporations to hold these stocks as collateral are adjudicated.

He further finds that during the time W. A. was in control of the corporations, he discovered that there were many outstanding notes and other evidences of indebtedness of D. M. secured by collateral in the shape of stocks and bonds both of the Columbia Securities Company and the underlying corporations, and these he redeemed by paying such indebtedness with funds which he took out of the various underlying corporations as he was authorized to do according to the contract. The aggregate of these claims against D. M. was many thousand of dollars.

At the time that W. A. returned such stocks and bonds as he did deliver to D. M. the latter claimed an indebtedness of $14,277.77 from the Columbia Securities Company. All the other brothers denied this claim. On the other hand W. A. on behalf of some of the underlying corporations claimed that D. M. was indebted to them in the sum of approximately $60,000, and that these corporations had the right to hold some of the stocks and bonds of D. M. as collateral security for this alleged indebtedness. " Such indebtedness has never been paid by D. M. James or his Estate, and there is no offer made by the Estate to pay it." The master specifically finds as above stated that the plaintiffs as administrators of the estate of D. M. James, have never been, and are not now, in possession of certificates of stock sufficient in number to make up the difference between what was turned over to the Columbia Securities Company by D. M. and the amount he had agreed to deliver.

It is the contention of the plaintiffs that W. A., under the agreement of November 20, 1913, had authority to save the collateral by the payment of the outstanding debts individually and thus acquire the collateral which he would hold under the agreement; that he did pay the indebtedness of D. M. James for which these stocks and bonds were held as security, with money furnished by some one or more of the underlying corporations; and that he had no right to turn over the stocks and bonds to the companies furnishing the money. We think the redeemed stocks and bonds were properly held as security by the corporations which furnished the money to discharge the indebtedness of D. M. James; and that it would be inequitable to hold that such stock thereby became free of liens without the repayment of the money borrowed on it by D. M. James.

The plaintiffs filed objections and exceptions, sixteen in number, to the master's report. These exceptions are argumentative statements of alleged facts, from which the plaintiffs contended that the master drew an erroneous conclusion of fact " that the plaintiff is not able to carry out his part of the contract and, therefore, is not entitled to specific performance; " or are directed to an attack upon the finding of the master that the conduct of the trustee and its representative " was wise and impartial." The plaintiffs state in their brief that the responsibility of the trustee, and the exceptions taken to the master's report in respect to his findings in relation thereto, do not fundamentally affect the relief asked for specific performance and are of importance only in case specific performance is decreed and the occasion calls for the appointment of a new trustee. The exceptions taken as a whole, in the language of the plaintiffs " bear . . . only on the form of the relief asked for." In the aspect of the relief now sought by the plaintiffs, specific performance of the agreement, no assistance to the determination of this issue could come from the long analysis of the facts found by the master in reference to acts of the trustee and its attorney. Accordingly no reference is made thereto. A careful examination of the facts set out in the exceptions, and a comparison of them with the findings of the master

and his conclusions of fact therefrom, require that the several exceptions be overruled.

On June 27, 1922, after the denial of a motion to recommit for reasons not disclosed in the appeal record, after the overruling of the exceptions to the master's report, the confirmation of the report, and after an appeal from the interlocutory decrees entered June 15, 1922, the plaintiffs, without leave of court and without knowledge of the court, filed in court a document signed by the plaintiffs and by one only of the defendants, which reads: " Stipulation. Whereas H. J. James and Estate of D. M. James have jointly a sufficient number of shares in the several Pennsylvania corporations to complete the contract of January 31, 1910 (Exh. 2) and supplementary agreements in above entitled suit and have always been ready to use their stock jointly if necessary to do so. It is hereby stipulated that the said shares of H. J. James and D. M. James shall be used to furnish all the shares due to Columbia Securities Company under contracts to be specifically performed." On June 29, 1922, the court entered a final decree dismissing the bill. On July 17, 1922, the defendants, except H. J. James, filed a " motion to strike stipulation from record." This motion was allowed on July 19, 1922, and on the same day the plaintiffs and H. J. James appealed from the allowance of the motion and the plaintiffs from the final decree.

The question presented by this action of the court in reference to the so-called stipulation is, ought the court in the exercise of its equitable functions to have recommitted the case for further hearing or have taken evidence to determine, if the fact were disputed, whether the plaintiffs were then able to transfer the stocks and bonds to the Columbia Securities Company as required by the conditions of the agreement of January 31, 1910, and agreements supplementary thereto, even though they were unable so to do at the confirmation of the master's report. It is obvious that time is not of the essence of these agreements and if the plaintiffs have taken proper procedural steps and are able to perform the agreements they are required to perform, equity requires that the plaintiffs be permitted to perform

at any time before the entry of a final decree dismissing the bill. *Dresel* v. *Jordan,* 104 Mass. 407, 415. *Barnard* v. *Lee,* 97 Mass. 92. *McMurtrie* v. *Guiler,* 183 Mass. 451. *Hanscom* v. *Malden & Melrose Gas Light Co.* 220 Mass. 1, 9. *Ensign* v. *Faxon,* 229 Mass. 231, 233. *Langford* v. *Pitt,* 2 P. Wms. 629, 630. *Esdaile* v. *Stephenson,* 6 Madd. 366, 367. *Sidebotham* v. *Barrington,* 4 Beav. 110; 5 Beav. 261. Sugden on Vendors (8 Am. ed.) 264. *Coffin* v. *Cooper,* 14 Ves. 205. *Paton* v. *Rogers,* 6 Madd. 256.

After the filing of the so-called " stipulation " the plaintiffs took no steps to call the subject matter thereof to the attention of the court, they made no motion in reference thereto, and in their brief present no statement from which it can be learned or inferred whether the document so filed was intended as a mere declaration of fact or was intended by the signers to operate as a motion to discontinue as to H. J. and join him as a party plaintiff with his consent, and to amend their amended bill by alleging that the joint holdings of the plaintiffs and H. J. under the bill as amended were sufficient to enable them to specifically perform the contracts of D. M. and that they were ready to tender, and did by the bill tender sufficient stock to comply with the contract of January 31, 1910, and the supplementary contracts. While a motion to amend the bill was the proper practice, Equity Rule 25, *Hanscom* v. *Malden & Melrose Gas Light Co. supra, Reno* v. *Cotter,* 236 Mass. 556, 563, 564, it is obvious that the " stipulation " itself cannot take the place of such a motion: and plain that considered as a statement of fact to be proved, if disputed, its mere filing could not prevent nor stay the entry of a final decree in the suit which was ripe for such entry before the filing of such alleged fact. If the " stipulation " be treated as a motion to amend the bill, such motion was addressed to the equitable discretion of the court and the entry of the final decree was necessarily a refusal to exercise that discretion and a denial of the motion, without the entry of an interlocutory decree to that effect.

The motion to strike the stipulation from the record was filed after the entry of the final decree and the court was without jurisdiction to receive or pass upon it. *White* v.

*Gove,* 183 Mass. 333, 340. *Morgan* v. *Steele,* 242 Mass. 217, 218. The action of the court was not harmful to the plaintiffs and is disregarded.

It results that the decree dismissing the bill is affirmed with costs.

*Decree accordingly.*